In re **Estate** of
Aguida **Amires**, Deceased.
Appeal No. 95-012
Civil Action No. 92-1360
May 12, 1997

Argued and Submitted November 7, 1996

Counsel for Appellant Blandina Iguel Tenorio:  F. Lee Nelson, Saipan.

Counsel for Appellees:

William I. Webster, Special Administrator for the Estate of Larry Lee Hillblom:  Richard W. Pierce, Saipan. (White, Pierce, Mailman & Nutting)

Heirs of Rosa Amires Kotomor:  Brien Sers Nicolas, Saipan.

San Roque Beach Development Co., Ltd.:  Kevin A. Seely, Saipan (Mair, Mair, Spade & Thompson).

Estate of Magdalena Segian, Estate of Concepcion L. Norita, and Estate of Joaquin Amires [heirs of Maria Amires]:  Antonio M. Atalig, Saipan.

BEFORE: TAYLOR, Chief Justice, VILLAGOMEZ, Justice, and MACK, Special Judge.

TAYLOR, Chief Justice:

¶1     █Appellant, Blandina Iguel Tenorio ("Blandina" or "administratrix"), who is the administratrix of the estate of Aguida Amires ("Aguida" or "decedent"), appeals a judgment denying her proposed petition for distribution of the Estate's assets which consist of two parcels of land in Achugao, Saipan. Blandina contends that the real property in question should have been distributed in part to her, as an adopted heir of Amires' estate, and not solely to Amires' other adopted and natural heirs.

       We have jurisdiction under title 1, § 3102(a) of the Commonwealth Code. We affirm.

## ISSUES

¶2     The dispositive issues on appeal are:

       I. Whether the trial court erred in determining the elements of the (Carolinian) "Refaluwasch"[1] custom of mwei-mwei, and in ruling that the decedent did not adopt administratrix and Cecelia L. Pischi Taitano ("Cecelia")[2] under this custom.

       II. Whether the trial court erred in ruling that the land in question was Refaluwasch family land rather than land owned individually by the decedent.

## STANDARD OF REVIEW

¶3     [2,3] Both issues are mixed questions of law and fact reviewable de novo.[3] Within the context of our de novo review, determination of the proper elements of Refaluwasch customary law and the meaning of "family land" present questions of law,[4] while the trial court's factual findings as to the proof of adoption and the treatment of the land should be affirmed in the absence of clear error.[5]

## FACTUAL & PROCEDURAL BACKGROUND

### A. Overview

¶4     Angel Amirez, a Refaluwasch man who died in the late 1896, owned a tract of land in Achugao, Saipan. Angel was survived by three daughters: Rosa and Maria, and by Aguida, the decedent in this probate proceeding. Rosa and Maria died prior to World War II. Decedent, the youngest, passed away in December 1952.

¶5     The administratrix claims: (1) she is the decedent's adoptive daughter, and (2) the decedent held Achugao Lots 583 and 585, which comprise the estate, individually rather than as a customary land trustee. Appellees, the heirs of decedent's older sisters Rosa and Maria ("Rosa and Maria's heirs") and the purchasers and lessees of the land in question, assert: (1) the administratrix was not adopted by the decedent, and (2) decedent held Lots 583 and 585 as a trustee, in accordance with Refaluwasch custom, for the benefit of all of Angel's heirs.

### B. The Amires Family

¶6     In 1922, the decedent married Jose Rapugao ("Jose"). The decedent and Jose did not have any biological children.

¶7     During the 1920's, the decedent and Jose brought two "older children" into their home: the administratrix, who was born in 1915 to Rosa Iguel; and Cecelia, who was born in 1913 to Dolores Lialoan and a man called "Pischi." *Estate of Amires*, Civ. No. 92-1360 (N.M.I. Super. Ct. March 23, 1995) (mem. decision on pet. for

---

[1] This Court recognizes that the word "Refaluwasch" is a more accurate word than "Carolinian" to refer to persons of Carolinian descent who have settled in the Northern Mariana Islands. CAROLINIAN-ENGLISH DICTIONARY, compiled by Jackson, F. & J. Marck, Univ. Of Hawaii (1991) at 58 & 145.

[2] Cecelia is deceased. Her son, Cypriano, grew up in decedent Aguida Amires's household. Cypriano is also deceased. Neither Cecelia's heirs nor Cypriano's heirs are party to this appeal.

[3] *See Estate of Rangamar*, 4 N.M.I. 72, 74 (1993). *Cf. Estate of Kaipat*, 3 N.M.I. 494, 499 (1993) ("[w]e need to determine whether or not the properties in question are lands subject to [Refaluwasch] land custom. This issue is also a mixed question of law and fact, dependent upon how the land was acquired and treated"). *Cf. Ada v. Sablan*, No. 93-0030 (N.M.I. Sept. 23, 1994) (slip op. at 2-3) (unpublished decision) (classification of spousal property). In *Ada*, an unpublished decision, we held that:

       classifications of property as marital or separate . . . are

                                        (continued...)

---

(...continued)
       mixed questions of law and fact. The factual matters include the method and manner of acquisition of property, and the parties' treatment of the property. We will disturb the trial court's findings as to such matters only if we are convinced that the court has committed a mistake. However, a trial court's characterization of an asset as marital or separate property, in light of the facts found, is a question of law which we review *de novo*.

*Id.* (footnotes omitted).

[4] *Estate of Seman*, 4 N.M.I. 129. 130 (1994).

[5] *Estate of Rofag*, 2 N.M.I. 18, 30-31 (1991).

71

final distribution at 14). Excerpts R. at 94. Neither the administratrix nor Cecelia was a blood relative of the decedent or Jose. *Id.* at 11, 12, 14. Based on testimony presented at trial, the trial court found that the administratrix and Cecelia "grew up [in decedent's household] in an ambiguous position: not fully treated as [decedent's] children, but not expressly excluded." *Id.* at 13.

¶8 While living with decedent and Jose, Cecelia had a son, Cypriano L. Taitano ("Cypriano"), who was adopted at birth by Jose and the decedent. *Id.* at 11-12. Cypriano died prior to the filing of this probate proceeding.

¶9 The trial court found that Cypriano, unlike the administratrix and Cecelia, was accorded land rights by the Amires family. In contrast to the administratrix and Cecelia, Cypriano advanced his claimed land rights during subsequent years (see discussion of the land, *infra*, Subsection C), and his name appears, either as an interested party or as an adopted child of decedent, in land documents dating from 1970.

## C. The Land

¶10 For "some time" after Angel died in 1896, his eldest daughter Rosa acted as trustee of the Achugao land. *Id.* at 6.

Land documents from Japanese times list the decedent and three of her nieces -- children of Maria -- as "co-owners" of Lots 583 and 585.

¶11 In 1953, the TT Land Commission issued T.D. 748, finding ownership of Lots 583 and 585 in "the heirs of [decedent] Aguida, represented by [decedent's husband] Jose Rapugao as land trustee." *Id.* at 3. The T.D. 748 file contains a statement by decedent in which she claims ownership through inheritance from "Amires." *Id.*

¶12 In 1970, a Land Registration Team also found that the "heirs of [decedent]" owned the lots in question. The team based its finding on the testimony of Cypriano and decedent's nephews and nieces (Maria's children-in-law). *Id.*

¶13 Maria's children quitclaimed part of the property to Cypriano in 1972. A year later, the children and grandchildren of Rosa, decedent's oldest sister, filed claims with the Land Commission asserting an ownership interest in the property. The Commission found the land to be owned by "the heirs of [decedent]," and it issued a Determination of Ownership in that name.

¶14 The descendants of Rosa and Maria similarly brought opposing claims before the Micronesian War Claims Commission for compensation for war damage to Lots 583 and 585. After a hearing at which both parties presented testimony, the Commission ruled that it had before it "no persuasive evidence to lead it to conclude other than that Maria, [decedent] Aguida and Rosa were all legitimate children of [Angel] Amires." *Id.* at 3-4. The Commission

awarded the claim to the "Heirs of Amires" and appointed one of Rosa's children to receive the award on behalf of the family. Cypriano Taitano and Maria's children filed suit in U.S. District Court in 1978, asserting that Rosa's child was not sharing the War Claims money with them. The case concluded with a stipulation that a trustee would distribute the money to Cypriano Taitano and Maria's heirs.

¶15 In 1982, Cypriano and the descendants of Rosa and Maria made various conveyances among themselves, dividing Lots 583 and 585 among themselves. The parcels were eventually sold to real estate developers.

¶16 The trial court found the documentary evidence of the above claims and transactions devoid of any indication that administratrix or Cecelia ever claimed or asserted land rights based on customary adoption by decedent. The court also found that Cypriano never made claims to the land on behalf of his birth mother Cecelia, or on behalf of his adoptive aunt, the administratrix. *Id.* at 13-14.

## D. The Present Action

¶17 In 1992, the administratrix filed a Petition for Letters of Administration for decedent's estate, and she listed herself, Cecelia, Cypriano and their children as the decedent's heirs. Administratrix listed Lots 583 and 585 as the estate's only assets. Asserting that she, Cecelia, and Cypriano had all been adopted through the Refaluwasch custom of mwei-mwei, the administratrix claimed that she, Cecelia's heirs, and Cypriano's heirs were each entitled to a one-third share of the Lots. Objections were filed by the descendants of Rosa and Maria, as well as the commercial developers who now have interests in the Lots.

The trial court found that the decedent did not adopt the administratrix or Cecelia through mwei-mwei:

> [Administratrix] and Cecelia were brought into [d]ecedent's household as older children. Further, they were not related to Aguida by blood. These two facts are outside the traditional parameters of the [Refaluwasch] *mwei-mwei* adoption practice, as described by the experts here and as discussed in other authorities. From both the expert testimony on custom and the lay evidence on adoption practices of this family, Cecelia and Blandina are entitled to land rights only if [decedent] had expressly granted them such rights. [N]o such express grant was present here . . . .

*Id.* at 14 (internal citations omitted) and at 10-11. Cecelia's heirs and the administratrix, therefore, were not heirs of the decedent for purposes of *inheriting* land.

¶18 The trial court further determined that Lots 583 and 585 were Refaluwasch family land that decedent had held

as a customary trustee for the benefit of her heirs and the heirs of her sisters, Rosa and Maria. *Id.* at 8. As these lots had already been distributed "to the legitimate heirs of [the decedent],"[6] the court concluded, they were not subject to redistribution as part of decedent's estate. The administratrix timely appealed.

## ANALYSIS

### I. Status of the Alleged Mwei-Mwei Adoptees.

¶19 ■ Blandina contends that the trial court erred when it concluded that she and Cecelia were not adopted under the Refaluwasch custom of "mwei-mwei." "Mweimwey" [mwei-mwei] means "adopted children [or child]."[7] In *Estate of Rofag*, 2 N.M.I. 18, 23 n. 3 (1991), this Court stated:

> "Mwei-Mwei" is a [Refaluwasch] customary method of adopting children. Normally, the child to be adopted is a baby, but there is evidence that a child who is nine, ten, or eleven years old could be customarily adopted, depending upon the circumstances. The adoption takes place between relatives, initiated by the women and normally a married couple, as opposed to a single person, adopt the child. (There is also evidence that single persons have adopted children by custom.)
>
> Customarily, the adopting parents propose to adopt a child and the natural parents must give their consent. Once the child is adopted under this custom, he/she is treated and considered as a natural child for all purposes.

¶20 ■ While most adoptions occur between relatives, it is practicality which developed this trend into custom. "With only one recorded exception, all adoptions take place between relatives." A. Spoehr, SAIPAN: THE ETHNOLOGY OF A WAR-DEVASTATED ISLAND, 41 Fieldiana: Anthropology (Chicago 1954), at 356 (hereinafter "Spoehr"). In most cases, it is far easier to garner the sympathies of relatives who might be more amenable to allowing their child or children to be adopted by other relatives, as opposed to eliciting the sympathies of non-related persons. In his book, Spoehr wrote of Refaluwasch adoption:

> The motivations for adoption are various. If a man and his wife have no children, or if their children are nearly grown and they wish a young child in the family, or if they simply wish to have more children about, they may ask to adopt a child. Babies whose mothers have died, and illegitimate children may be adopted. On the giving side, if parents have many children and are hard put to feed them all, they will be only too willing to have a new youngster adopted.

*Id.* at 357. Spoehr is not accurate, however, when he writes that "only babies may be adopted." *Id. Rofag* accurately states that "[n]ormally, the child to be adopted is a baby, but there is evidence that a child who is nine, ten, or eleven years old could be customarily adopted, depending upon the circumstances."[8]

¶21 This Court is not convinced that the trial court erred in finding by clear and convincing evidence that Aguida Amires did not adopt Cecelia and the administratrix through mwei-mwei although it wrongfully determined two elements of the Refaluwasch custom:

> In sum, the [Superior] Court finds that Blandina [Administratrix] and Cecelia were brought into Decedent's household as older children. Further, they were not related to Aguida by blood. These two facts are outside the traditional parameters of the [Refaluwasch] mwei-mwei adoption practice, as described by the experts here and as discussed in other authorities. [citations omitted.] From both the expert testimony on custom and the lay evidence on adoption practices of this family, Cecelia and Blandina are entitled to land rights only if Aguida had expressly granted them such rights. Since no such express grant was present here, the Court finds that neither Cecelia, Blandina, nor their descendants, have any share in Lots 583 and 585.[9]

The two reasons cited by the Superior Court -- (1) that Blandina and Cecelia were brought into the household as older children and (2) that they were not related to decedent by blood -- are not exclusive elements of mwei-mwei, following this Court's opinion in *Rofag*. We are not persuaded, however, that the Superior Court's ruling constitutes reversible error.

¶22 This Court agrees with the trial court that Blandina's testimony, that she did not know Aguida was not her

---

[6] *Id.* at 14-15. It appears from the record that "has already been distributed" means distributed by the family members, i.e., Cypriano and the heirs of Maria and Rosa, among themselves.

[7] CAROLINIAN-ENGLISH DICTIONARY, compiled by Jackson, F. & J. Marck, Univ. of Hawaii (1991), at 119.

[8] *Estate of Rofag, supra*, 2 N.M.I. at 23 n.3.

[9] *Estate of Amires, supra*, at 14.

73

biological mother until her wedding when she was in her 20's, is not credible. Blandina was already an "older child," over five years old, when she was brought into decedent's household. Even as young as four years of age, children usually know the identity of their parents¶23 Furthermore, Blandina herself stated that "she never received any 'authority'[10] from Aguida to share in the land. Indeed, the substance of her testimony is that she believed she did *not* have a right to the land."[11] In the absence of clear error, which Appellant has failed to establish, this Court must affirm the trial court's holding that administratrix and Cecelia were not adopted by decedent.

## II. Ownership Character of the Land

¶24    ■ Contrary to the administratrix's assertion, the fact that decedent's father, Angel, was a male landowner is not necessarily conclusive of the character of the land. We have previously observed that:

> [Refaluwasch] males that received property under the [German] homestead program held the land individually. While some of these males gave their land to both female and male heirs, others chose to give the land only to the daughter(s) who then subsequently founded a new matrilineal lineage. Hence, the applicability of [Refaluwasch] land custom to such lands became dependent upon the subsequent treatment of the land by the *female* recipient(s) of the land.[12]

¶25 Angel died in 1896, some three years prior to the commencement of the German administration in 1899, and the parties presented no evidence to the trial court about the character of Angel's acquisition or ownership of the land.[13] Nevertheless, the above principle could still be applied here. We focus on determining whether Angel's daughters treated the land as Refaluwasch family land, in view of our holding in *Rangamar*:

> [W]here the history of the land in an estate, to which the probate code is inapplicable, or the activities of the heirs in relation to the land, are consistent with [Refaluwasch] land custom, the custom should be applied and the female heirs will hold title. Otherwise, where the land is not family land or the females consented to treatment inconsistent with [Refaluwasch] land custom, the court may allow the division of the property among individual male and female heirs.[14]

This rule appears to leave unanswered the question of precisely when the land becomes Refaluwasch land.

¶26    ■ We reiterate that the determinative factor is how the family treated the land after the male owner's death.[15] Therefore, the determinative time is at the death of the male owner. In the present case, Angel died in 1896. The record indicates that the members of the Amires family held ownership and treated the Achugao land as family land after Angel's death.

¶27    Therefore, the trial court correctly found that Lots 583 and 585 were family land when inherited by decedent and that she held these lots as customary trustee for the descendants of her sisters Maria and Rosa, as well as for her own heirs.

## CONCLUSION

¶28    For the foregoing reasons, we **AFFIRM** the Superior Court's order that:

   1. Neither administratrix nor Cecelia, nor their descendants, are heirs of Aguida Amires for the purposes

---

[10] In her testimony, administratrix used the word "pudet," which in Chamorro means "have authority, be able, power." *Estate of Amires, supra*, at 11.

[11] *Id.* (emphasis in the original) (internal citations omitted).

[12]  [12] *Estate of Rangamar, supra*, 4 N.M.I. at 76 (internal quotation marks and citations omitted) (emphasis in original). In addition to *Rangamar*, our later decision in *Estate of Ogumoro*, 4 N.M.I. 124 (1994), while factually distinguishable from the instant case, should also be carefully reviewed. The male decedent in *Ogumoro*, who died in 1912, owned land individually and was survived only by three sons. In our opinion, we observed that prior governments' "practice of putting land title in the name of a [Refaluwasch] man is inconsistent with the [Refaluwasch] land tenure system." *Id.*, 4 N.M.I. at 128 n.7. We proceeded, however, to reject the argument that decedent's land had ever assumed the character of Refaluwasch family land, because after his death:

> his surviving children were all males, precluding any possibility of the land's ownership being transformed in character from individual male ownership to matrilineal ownership. Moreover, [decedent] himself, because of his
> (continued...)

(...continued)
> gender, *could not have owned [Refaluwasch] family land,* just as he could not have been part of a matrilineal group.

*Id.,* 4 N.M.I. at 128 (emphasis added).

[13] *Estate of Amires, supra*, at 7.

[14] *Id.* at 12.

[15] Such a holding would not be inconsistent with *Rangamar*, which involved a Refaluwasch man who died in 1980 and whose family probated his estate relatively shortly thereafter, in 1989.

of inheriting the Achugao land; and

2. The property in question was Refaluwasch family land and its distribution has already been agreed upon by the heirs of the decedent, Maria and Rosa. The probate court may distribute the land in accordance with that family agreement.